In the Matter of the Application of JOSEPH MERENDINO, Petitioner, for an Order Pursuant to Article 78 of the Civil Practice Act to Review a Determination of FRANK P. GRAVES, Commissioner of Education of the State of New York, and Others, Respondents.

Third Department, March 8, 1939.

Illch & Poskanzer [Avrom M. Jacobs of counsel], for the petitioner.

John J. Bennett, Jr., Attorney-General [Henry Epstein, Solicitor-General, and Dorothy U. Smith, Assistant Attorney-General, of counsel], for the respondents.

RHODES, J. A license to practice podiatry was heretofore issued to petitioner pursuant to the provisions of article 53 (§ 1400 et seq.) of the Education Law. Thereafter written charges were preferred against him by an investigator appointed by the Regents, one charge being to the effect that at his office, without lawful authorization, he " unlawfully practiced medicine upon Ethel Scolnick," the second charge being to the effect that he there " unlawfully practiced medicine upon Lillian Stark."

After a hearing before the State Board of Podiatry Examiners the charges were upheld and findings were made in practically the identical language of such charges. The Board recommended that petitioner be suspended from the practice of podiatry for one year, but upon a review by the Board of Regents the recommendation of the Board of Podiatry Examiners was modified, and it was ordered that his authorization to practice podiatry be annulled and that his registration as a podiatrist be annulled and canceled of record.

The evidence against him consists of the testimony of three women investigators for the Department of Education, the gist of whose testimony he frankly admits.

The principal facts charged and found to support the allegations that he unlawfully practiced medicine upon Ethel Scolnick and Lillian Stark are to the effect that petitioner gave them chiropractic treatments, diagnosed their condition, and gave them advice as to care and treatment of their bodily condition. He admits that he examined these women and that he gave Mrs. Scolnick spinal adjustments, but denies that he gave chiropractic treatments to Mrs. Stark.

In further support of the charges it was testified that he gave to one of the investigators certain literature consisting of pamphlets discussing chiropractic treatments and various subjects relative to health, and that he also gave her a card bearing his name, followed by the abbreviation Ph. C., which he said means Philosopher of Chiropractic.

He testified that he was much interested in " chiropractic " from a scientific standpoint; that the pamphlets which he furnished were advertisements or circulars which had been sent to him from a company which sought to sell him a quantity, but that he did not buy any. He had attended chiropractic schools, including a New York school of chiropractic, from which he received a so-called diploma and certificate, and has a license from the State authorities to practice as a chiropractor in the States of Maryland and New Jersey, of which latter State he is a resident and in which he has an office for such practice.

When Mrs. Scolnick first called on him she stated that she was a friend of Dr. Bloomenreich, who had sent her to him for treatment. She told him that Dr. Bloomenreich considered him little short of a miracle man and that he had done so much for Dr. Bloomenreich she wanted to see if he could help her.

Dr. Bloomenreich was a podiatrist whom he had met at chiropractic meetings. He had told petitioner that he was very much interested in chiropractic; that " chiropractic had saved his life; " petitioner had given him chiropractic treatments and he had asked petitioner to be kind enough to see relatives and friends whom he thought he could help. Petitioner testified that he had never practiced chiropractic in this State; that it was not his intention so to do; that he is interested in " chiropractic " purely as a science, having devoted many years to the study; that he had adjusted a few relatives and charity cases, and no others, except four, including Mrs. Scolnick. While in the chiropractic school he gave adjustments at clinics and to several relatives and friends, who were given the treatments without fee for the purpose of his training, as a scientific lesson.

When Mrs. Scolnick consulted him she said that she did not have much money; that she was poor. He testified, " I said to her the money really didn't matter; my interest in chiropractic was from a scientific standpoint, and being Dr. Bloomenreich sent her I was perfectly satisfied to treat her and she said, of course, she didn't have the money, she didn't know, she would try to raise it." Both she and Mrs. Stark paid him for one or two visits, but received other treatments without paying therefor.

The practice of medicine is defined by subdivision 7 of section 1250 of the Education Law, and the practice of podiatry is defined in

subdivision 5 of section 1401 thereof. Paragraph (d) of subdivision 1 of section 1412 permits the suspension or annulment of the license of a podiatrist who " has undertaken or engaged in any practice beyond the privileges and rights accorded to him in his license." Technically, it is true that the acts admitted by petitioner constitute the practice of medicine and the engaging in a practice beyond the privileges and rights accorded to him as a podiatrist. His counsel admitted that no one has the right to practice " chiropractic " in this State unless he is a licensed physician. Upon the record before us, however, we do not think it has been established satisfactorily that he is engaging in the practice of medicine or violating the terms and conditions of the statute under which he holds his license as a podiatrist, according to ordinary meaning and understanding. The instances are too few, casual and trivial. His testimony is undisputed that these are the only instances of transgression. No one questions his competency as a podiatrist, and as such it appears that his practice is fairly remunerative, averaging about fifteen podiatry patients a day at two dollars each, besides orthopedic treatments at five dollars per treatment. This fact lends color to his insistence that he does not engage generally in " chiropractic." It at least indicates that he is not driven to resort to unauthorized practice because of financial necessities and permits the inference that his interest is, as he claims, purely scientific.

The Board which heard the charges seemingly considered suspension for a year sufficient punishment; nevertheless, the Board of Regents has ordered permanent suspension and revocation. In the face of a penalty so drastic, justice requires that there be proof of more flagrant violation of the law than the isolated and technical instances here shown, before such punishment is inflicted. Upon the record we are not convinced of his guilt of more than a technical disobedience of the statute.

The order should be annulled on the law and facts and the matter remitted for further hearing.

HILL, P. J., McNAMEE and HEFFERNAN, JJ., concur; BLISS, J., dissents, with an opinion.

BLISS, J. (dissenting). I dissent from the opinion of Judge RHODES and vote to confirm the order of the Commissioner of Education revoking petitioner's authorization to practice podiatry and canceling his registration as a podiatrist.

It was conceded by the petitioner on the hearings below, and is conceded in the opinion of Judge RHODES, that the petitioner violated the statute and actually practiced medicine under his license as a podiatrist. It is urged, however, that his violations were but technical and were too few, casual and trivial to warrant

a revocation of his license. Roughly speaking, a license to practice podiatry limits the practitioner to a diagnosis of foot ailments and the practice of minor surgery upon the feet, together with the palliative and mechanical treatment of deformities and functional disturbances of the feet. The evidence against petitioner was all furnished by paid women investigators of the Department of Education who went to him and asked for treatment. The Board of Podiatry Examiners which heard the charges against the petitioner has found that he questioned one of these investigators concerning her general physical condition, required her to disrobe, used upon her neck and back an apparatus allegedly for the examination of nerves, pressed, manipulated and prodded her back and spine, twisted her neck, jerked her head from side to side, pressed upon her forehead, said that her trouble was pressure on the nerves and a generally rundown condition, that she would need at least ten treatments at five dollars each, advised her to have X-ray photographs taken of her whole spine, lateral and cervical, so that he could work properly and give her better results, described the condition of her spine and said that he could cure hay fever with his treatments; took her blood pressure with the use of an instrument and said it was a little low, but not bad, listened to her chest wall with a stethoscope and said that her heart was good, took her pulse, examined the mark of an incision on her abdomen and said that an ovary had not been removed, that his treatments would relieve pressure on the spine which was the cause of hay fever, that after a few treatments he would bring the blood pressure up to normal. He told her she had arthritis and two bad curvatures of the spine and that her left hip was higher than her right. As to the other investigator, he questioned her concerning her general physical condition, felt of her spine, feet and ankles, said that the muscles of the calf of her left leg were strained, pressed, manipulated and prodded her back and spine, twisted her neck, jerked her head from side to side, jerked her left shoulder, leg and foot and manipulated her feet, told her there was pressure on her sciatic nerve and that such pressure caused pain and that he could cure her and that she needed five or six of his treatments at five dollars each. The evidence, if one is to believe the investigators, amply sustains the findings. In fact, the petitioner admitted the performance of many of the acts found which went far beyond the practice of podiatry. I fail to find any extenuating circumstances. It is rather difficult to understand what more the petitioner could have done had he been a fully licensed doctor of medicine. Under the guise of a podiatrist he assumed to practice medicine.

I, therefore, dissent and vote to confirm the determination below.

Determination annulled on the law and facts, and matter remitted for further hearing.